UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION


IN RE:  D.D., the minor child,

FREDERIC DALLEMAGNE,

                   Petitioner,

vs.                              Case No.  2:06-cv-117-FtM-29DNF

CORY DALLEMAGNE,

                   Respondent.
_____


### OPINION AND ORDER

_____This matter comes before the Court on Frederic Dallemagne's (petitioner) Petition for Return of Child to Petitioner (Doc. #1), filed on March 8, 2006.  Petitioner alleged that Cory Dallemagne (respondent), his wife and the mother of his daughter, wrongfully removed their minor child (D.D. or "the child") from France and has wrongfully retained her in the United States.  The Petition was filed pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670 (the "Hague Convention"), as implemented by the International Child Abduction Remedies Act, 42 U.S.C. §§ 11601-11610 ("ICARA").

Despite being properly served with the Petition on March 31, 2006 (Doc. #7-3), respondent did not file an Answer.  Respondent made no appearance in the case until she appeared before the Court on July 5, 2006, the date set for the trial of this matter, and

filed a Motion for Continuance (Doc. #14).  For reasons stated on the record, the Court denied her Motion for Continuance.  The Court proceeded to hear testimony from both sides, and received various exhibits from petitioner.  At respondent's request, the Court then continued the remainder of the trial until July 10, 2006, to enable respondent to present statements she said she had from counseling services stating that the children would be in grave risk if returned to France, and that it would cause psychological or physical harm to them.

On July 10, 2006, respondent appeared, represented by counsel. Respondent and her father testified, but no statements from counseling services were introduced.  The Court also heard further testimony from petitioner.  Petitioner filed a Supplemental Memorandum (Doc. #20) on July 11, 2006, regarding a legal issue raised by the Court at the conclusion of the evidence.

## I.  Findings of Fact

Petitioner is a 28 year old citizen of France who currently lives with his parents in Foure de la Vigne, France, and is currently employed as a forklift driver.  Respondent is a 27 year old citizen of the United States who was born in Oklahoma and currently lives in Naples, Florida, with her father.  Petitioner arrived in the United States in September, 1998, and met respondent in January, 1999.  Petitioner and respondent were soon living together in Naples, Florida.  In June, 1999, respondent discovered she was pregnant, and petitioner and respondent were married on

August 28, 1999, in a civil ceremony in Marco Island, Florida. Petitioner's Exhibit 2.  By the time of the marriage, petitioner had overstayed his visa in the United States.  At the time of their marriage, respondent had a four year old son from a previous relationship.  A daughter - D.D. - was born to petitioner and respondent in Naples, Florida, on January 29, 2000.  Petitioner's Exhibit 1, Tab A.  Petitioner was the father-figure for both children, even though only D.D. is his biological child.[1]

After the wedding, neither petitioner nor respondent was working, and they decided to move to France.  Respondent testified that she agreed to move to France for one year; petitioner's testimony did not mention any anticipated time limitation on the move. At the July 10, 2006, hearing, respondent testified that her agreement was to move to France for one year, or maybe two, and but for petitioner's abusive conduct in France she would have been happy to stay there.  On June 4, 2000, petitioner, respondent, respondent's son, and D.D. moved to France.

Petitioner, respondent, and the two children lived with petitioner's parents from June, 2000 until March, 2001. Respondent testified that after two months she became depressed from petitioner's verbal abuse towards her and her son for not trying to

---

[1]Respondent's son is not the subject of the Petition because petitioner concedes that under French law he has no legal rights of custody concerning respondent's son.  Accordingly, respondent's removal of her son from France and retention in the United States was not "wrongful" within the meaning of the Hague Convention.

adjust to French life.  Respondent testified that she was unable to work, did not know the French language, lacked papers needed in France, and felt petitioner's family was showing favoritism towards her daughter and over her son.  Respondent testified she asked for counseling many times, but was never given permission to obtain it.

Respondent testified that in November, 2000, petitioner agreed to send her to the United States to work, with petitioner and the children to join her after she obtained an apartment.  Respondent went to Oklahoma and obtained money for an apartment.  Petitioner decided not to come, however, telling respondent she could stay in the United States but the children would stay in France.  Petitioner testified that respondent decided she did not want to work in Oklahoma.  In any event, respondent then returned to France and lived with petitioner and the children in the home of petitioner's parents.

Respondent testified that during their time in the home of petitioner's parents, the petitioner constantly yelled at his mother and spoke to her with vulgarity.  Respondent testified that this was part of his character towards women, which he could not control.  Petitioner denied any such conduct.

In April, 2001, petitioner and respondent obtained their own apartment in Domont, France, and lived there together for almost three years.  Respondent testified that the verbal abuse then became physical towards respondent and her son.  Respondent testified that in August, 2002, she found work in France, and saw

-4-

the first signs of unfaithfulness by petitioner. Respondent testified that in February, 2003, she and petitioner were arguing in their kitchen when petitioner hit her with his fist, knocking her to the floor. Respondent testified that she was knocked out for 2 to 3 minutes, but she heard the children run into the kitchen and ask if she was dead. When she regained consciousness, petitioner started crying and respondent asked him to leave. Petitioner left, returning later that night to apologize. Respondent did not call police about this incident.

Eventually respondent called several attorneys for information about divorce and child custody in France. Three different law firms told respondent her chances of winning any custody were very small due to her lack of French residency. Respondent finally asked for a separation, to which petitioner agreed. Petitioner left the apartment on January 1, 2004.

Petitioner's version of the pre-separation events is significantly different. While acknowledging some adjustment problems by respondent, petitioner testified that respondent worked in a grocery store for about two years, both before and after their separation; that she had papers which petitioner helped her obtain for legal status in France, and that she took French classes after her return from the November, 2000, trip to the United States. Petitioner denied ever striking respondent, including the kitchen incident. Petitioner agreed that by the time of the separation petitioner and respondent were arguing about "everything,"

including money problems and petitioner's suspicion that his wife was having an affair. Petitioner maintained that these arguments were simply yelling, and he never became physical or abusive with respondent or the children.

After the January, 2004 separation, petitioner lived with his parents, leaving respondent and the two children in the apartment. About three months later, respondent's French boyfriend moved into the apartment with respondent and the two children. Respondent testified that her relationship with this boyfriend was never intimate.

Respondent testified that shortly after the separation began, petitioner would come to the apartment at night, usually drunk, bang on the door, yell to the children, and beg the children to open the door. Respondent testified that petitioner had both an illegal drug and an alcohol addiction problem. Respondent testified that calling the police was "a joke" because they would not write reports or do anything because petitioner was her husband and she was not French. Respondent testified that at least twice she asked to file a police report, but was refused; she never went to the police station to make a report. A certification from the French National Police Force, Petitioner's Exhibit 16, states that no police reports were made by respondent. Although petitioner admitted he and respondent smoked hashish, he otherwise denied the truthfulness of respondent's testimony.

During the separation petitioner and respondent had an informal arrangement with regard to custody of both children. Although there is some dispute as to the details, essentially they each took custody of the two children during portions of each week. The children would stay with petitioner at his parents' house, where they had their own room. Respondent testified that after the fourth visitation the children began to cry and did not want to go with petitioner because he would yell at them and say mean things about respondent. Petitioner denied this, testifying that neither child ever refused to accompany petitioner during the period of separation, and he never refused to take them.

Respondent testified that in October, 2004, during one of petitioner's visitations, he had picked up the children and was angry at respondent. While driving a vehicle, petitioner followed respondent as she walked down the street, screaming obscenely at her. With both children in the car, petitioner then attempted to run over respondent with the car. Respondent testified that she called the police within five minutes of the event, but was told she should have called during the event and since there were no adult witnesses nothing could be done. Petitioner denied that any such event ever took place.

Respondent testified that petitioner's parents were the ones who actually cared for the children during the separation, not petitioner. Respondent testified that the parents' home was dirty, and the children were often returned to her filthy and not bathed.

Respondent testified that petitioner constantly verbally abused his mother, and that this was not a household to which she wanted her child to return.  Petitioner denied such conduct.

During the separation, petitioner continued to serve as a father-figure to both children, and paid for various expenses such as day care, a school for writing, clothing, doctor bills, and at least one electric bill for respondent.  Medical insurance was provided to the children through the French government, and petitioner took his daughter to the doctor for check-ups, and took both children to school.  Petitioner's daughter attended public school in Domont, and petitioner would drive her to school and spoke with school personnel about her.  The only problem reported by school officials to petitioner concerned respondent's boyfriend calling the school about petitioner's daughter on one occasion.  Petitioner spoke with his daughter almost daily during his separation from respondent.  Petitioner testified there were no problems between petitioner and respondent concerning seeing the children when each wanted to do so.

A letter from the child's school principal indicates the school had never seen any signs of mistreatment by either parents, and the child had never spoken of any such mistreatment.  Petitioner's Exhibit 6.  A letter from petitioner's sister, Petitioner's Exhibit 8, attested to petitioner's good relationship with both children, as did a letter from a long-time friend, Petitioner's Exhibit 9.  A letter from a neighbor of petitioner and

-8-

respondent, Petitioner's Exhibit 10, confirmed that petitioner picked the children up weekly during the separation.  A letter from the child's nanny of more than a year, Petitioner's Exhibit 11, states that there were no signs of mistreatment of the child, and the child was extremely outgoing and adored her father.  A letter from respondent's son's principal, Petitioner's Exhibit 12, states that there were no signs of battery regarding that child, and any such signs would have resulted in a filed report.  Respondent conceded that her daughter's doctor never made any report to authorities about any observed physical abuse on the child.

Sometime during the separation respondent again went to the United States.  Petitioner testified that due to problems with her live-in boyfriend, respondent asked petitioner and his father to change the lock on the apartment.  Petitioner did so, retaining a key to the new lock.  Respondent testified that the boyfriend was out of the apartment by January, 2005.  Respondent testified she went to the United States and returned to France twice during the marriage, while petitioner testified respondent went to the United States every year.

On March 25, 2005, petitioner went to the apartment and had an argument with respondent.  Although both parties agree that neither child was present, their accounts of the events differ fairly dramatically.  Petitioner testified that he entered with a key, argued with respondent, respondent called the police, the police arrived, and he was escorted out by the police and left.

Respondent testified that petitioner kicked in the door and tried to beat her but she locked herself in the bathroom and called the police.  Before the police arrived, petitioner attempted to break the bathroom door saying he would kill himself right there if she did not open the door.  The police arrived within 7-9 minutes, saw the damaged door and red marks on respondent's body, told her to forgive her husband and let him cool down, and told petitioner to leave.  Respondent testified she requested to make a report, but the police refused.  A letter from the French National Police reflects that an intervention took place on March 25, 2005, but no complaint was filed.  Petitioner's Exhibit 17.

Respondent testified that she felt she had made sufficient efforts to obtain help for the domestic abuse, and had no choice but to flee France.  When respondent left the apartment for good, she left two letters for petitioner inside the apartment, dated March 28, 2005.  Petitioner left France on March 30, 2005, with both children, and arrived in the United States on March 31, 2005 with both children.  Respondent testified that she originally intended to go to Oklahoma (where her sister lived) after visiting her parents in Florida.  Respondent tried to obtain an attorney in Oklahoma, but he wasn't familiar with the Hague Convention.  Because of this, respondent went to stay at her parent's house in Naples, Florida.  Respondent has never returned to France.

On April 4, 2005, petitioner was unable to contact respondent by telephone, and learned that his daughter had been taken out of

school for several days.  Using his key, petitioner entered the apartment and found it empty except for a box containing the two letters from respondent (Petitioner's Exhibit 3), their rings, some pictures, and some documents relating to respondent's French boyfriend.

The first letter, addressed to "stupid idiot," stated among other things, that "my lawyer will contact you," thanked petitioner for going on vacation and giving her a three week head start, and concluded with "See you in Hell, M..... F....."  The second letter stated, among other things, that respondent knew her rights, she "already filed a paper that gives me the right to do it [take the children],"[2] she had a lawyer in Oklahoma, and respondent would call petitioner in a few days from Oklahoma.  The letter continued that petitioner would not find her, "so [you] better get a lawyer."[3]

Petitioner contacted lawyers and others in an attempt to find and return his child.  Petitioner reported the event to the French police, and criminal charges were filed in France against

---

[2]Respondent testified that this was untrue, and that she had not filed any such papers in France.  Respondent testified that she had meant that she had filed for a restraining order in the United States, but she conceded that this was done in April, 2005, after she arrived in the United States.  Thus, this explanation for her claim in the letter to have obtained prior legal authority to take the child makes no sense.

[3]The Court has omitted a number of expletives from the letters as generally irrelevant to the content of the letter.  The letters do indicate, however, that respondent is capable of the same type of vulgarity of which she accuses petitioner.

respondent for abduction of the child.  In April, 2005, petitioner filed an application with the French authorities for the return of his child pursuant to the Hague Convention.  Petitioner's Exhibit 1, Tab C.  Respondent would not voluntarily return the child.

Petitioner attempted to locate his wife in the United States by calling her mother.  Respondent returned the call, and gave petitioner an address in Naples belonging to her father.  In June or July, 2005, respondent changed her address and telephone number; petitioner testified she did not give the new information to him, while respondent testified that she had done so verbally.  Despite the references in the letters, no lawyer from the United States or France ever contacted petitioner, and petitioner never received any papers in France indicating respondent had permission to leave.

In June, 2005, petitioner filed for divorce in France and respondent was served with the complaint.  Petitioner's Exhibit 4. Efforts to have respondent return to France in connection with the divorce proceedings were unsuccessful.  Petitioner obtained a court order temporarily awarding him custody of his child and providing for visitation by respondent.  Petitioner's Exhibit 5.  The divorce remains pending, and petitioner and respondent are still married.

Petitioner attempted to enter the United States in September or October, 2005, to see the children, but was turned away by immigration authorities in Newark, New Jersey.

Petitioner spoke with respondent and the children several times after their removal from France, with respondent recording

the conversations.  Each time respondent placed the calls because petitioner did not have her telephone number. In March, 2006, petitioner spoke with respondent and obtained her number from his caller ID.  This lead to respondent being served with the Hague Convention Petition in the current case on March 31, 2006. Respondent then called petitioner, asking him to drop the case. Petitioner agreed to do so after respondent returned the child to France, but respondent would not agree.

On March 30, 2006, respondent's mother sent petitioner drawings and messages of love and affection made by the children. Petitioner's Exhibit 13.  The children wanted the letters sent to petitioner.

Respondent is currently eight months pregnant.  Petitioner is not the father.  Respondent testified that her daughter loves her father, but is in counseling services because respondent was subjected to physical violence in front of her and to verbal violence to her and her son.  The counseling was at school; the week before the current trial, respondent took the children for counseling at the David Lawrence Center.  During the week between the court hearings this month, petitioner and respondent agreed to virtually daily visitation with D.D. by petitioner.  Petitioner's lawful status in the United States expires on July 18, 2006.  A certification by the Ministry of Justice in France establishes that petitioner has no criminal convictions.  Petitioner's Exhibit 7.

Additional facts will be set forth below as necessary to resolve specific issues.

## II. Legal Principles

To address the harm done to children[4] by international parental kidnaping, the Hague Convention is designed to restore the factual status quo and protect the legal rights of the non-abducting parent. Ruiz v. Tenorio, 392 F.3d 1247, 1250 (11th Cir. 2004.) The stated objectives of the Hague Convention are (1) to "secure the prompt return of children wrongfully removed or retained in any Contracting State," and (2) to "ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States." Furnes v. Reeves, 362 F.3d 702, 710 (11th Cir.), cert. denied, 543 U.S. 978 (2004)(quoting the Hague Convention art. 1, §§ a-b). See also Ruiz, 392 F.3d at 1250; Bekier v. Bekier, 248 F.3d 1051, 1053 (11th Cir. 2001); Lops v. Lops, 140 F.3d 927, 935 (11th Cir. 1998), cert. denied, 525 U.S. 1158 (1999). Thus, a court considering a petition for the return of a child under the Hague Convention and ICARA "has jurisdiction to decide the merits only of the wrongful removal claim, not of any underlying custody dispute. . . . The Hague Convention is intended to 'restore the pre-abduction status quo and to deter parents from crossing borders in search of a more

---

[4]The Hague Convention effectively defines "children" as being under 16 years of age. When a child attains the age of 16 years, the Hague Convention ceases to apply. Hague Convention art. 4.

sympathetic court.'" <u>Lops</u>, 140 F.3d at 936 (quoting <u>Friedrich v. Friedrich</u>, 78 F.3d 1060, 1064 (6th Cir. 1996)). <u>See</u> <u>also</u> <u>Ruiz</u>, 392 F.3d at 1250; <u>Furnes</u>, 362 F.3d at 710.

The Hague Convention mandates the return of children to their circumstances prior to the abduction if one parent's removal or retention violated the custody rights of the other parent and was therefore "wrongful." Hague Convention art. 12; 42 U.S.C. § 11601(a)(4). The removal or retention of a child is "wrongful" where it (1) violates the "rights of custody" of the non-abducting person "under the law of the State in which the child was habitually resident immediately before the removal or retention," and (2) the rights of custody were actually being exercised at the time of the removal or retention, or would have been exercised but for the removal or retention. Hague Convention art. 3; <u>Furnes</u>, 362 F.3d at 711; <u>Lops</u>, 140 F.3d at 936 (citations omitted). Therefore, a petitioner establishes the elements of wrongful removal or retention by demonstrating by a preponderance of the evidence[5] that: (1) the habitual residence of the child immediately before the date of the allegedly wrongful removal or retention was in the country to which return is sought; (2) the removal or retention breached the petitioner's custody rights under the law of the child's habitual residence; (3) the petitioner was actually exercising or would have been exercising custody rights of the

_____

[5]42 U.S.C. at § 11601(e)(1)(A).

child at the time of his or her removal or retention; and (4) the child has not attained the age of 16 years. Ruiz, 392 F.3d at 1251; Lops, 140 F.3d at 936; Pesin v. Osorio Rodriquez, 77 F. Supp. 2d 1277, 1284 (S.D. Fla. 1999), appeal dismissed, 244 F.3d 1250, 1253 (11th Cir. 2001).  If petitioner meets this burden, the child who is wrongfully removed or retained must be promptly returned.  Lops, 140 F.3d at 936 (citing 42 U.S.C. § 11601(a)(4)).

The general rule that a wrongfully removed or retained child must be returned has six exceptions which excuse the return of the child.  Hague Convention art. 12, 13, 20; Mendez Lynch v. Mendez Lynch, 220 F. Supp. 2d 1347, 1357-58 (M.D. Fla. 2002).  A court is not bound to order the return of a child if respondent demonstrates by a preponderance of the evidence[6] that: (1) the person having care of the child was not actually exercising the custody rights at the time of removal or retention, Hague Convention art. 13a; or (2) the person having care of the child had consented to or subsequently acquiesced in the removal or retention of the child, Hague Convention art. 13a; or (3) "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views."  Hague Convention art. 13, unnumbered paragraph; or (4) the proceedings were commenced more than one year after the date of the wrongful removal or retention and "the child is now settled in its new environment."

_____

[6] 42 U.S.C. at § 11601(e)(2)(B).

Hague Convention art. 12.  Additionally, a court is not bound to order the return of a child if respondent demonstrates by clear and convincing evidence[7] that: (5) there is a grave risk that the child's return would "expose the child to physical or psychological harm or otherwise place the child in an intolerable situation," Hague Convention art. 13b; or (6) return of the child would not be permitted by fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms.  Hague Convention art. 20.  Even if an exception is established, the Court has discretion to order the return of a child if return would further the aims of the Hague Convention.  England v. England, 234 F.3d 268, 270-71 (5th Cir. 2000); Friedrich, 78 F.3d at 1067; Feder v. Evans-Feder, 63 F.3d 217, 226 (3rd Cir. 1995).

### III. Application of Legal Principles

**A.  Petitioner's Case:**

**(1) Preliminary Matters:**

The two threshold issues of any Hague Convention case have been established in this case.  The child was born on January 29, 2000, and is thus under 16 years of age.  Additionally, France and the United States became signatory to the Hague Convention prior to the removal of the child on March 30, 2005.

**(2) Child's Habitual Residence:**

-----

[7]42 U.S.C. at § 11601(e)(2)(A).

Petitioner is required to prove the child's habitual residence by a preponderance of the evidence.  Petitioner asserts that France was the child's habitual residence at the time of her March 30, 2005, removal from France (Doc. #1, ¶¶ 5, 7).  The legal principles that govern this determination were discussed at some length in Ruiz, 392 F.3d at 1252-55.

The Court first looks to whether there was a settled intent to abandon the prior habitual residence by the person(s) entitled to fix the place of the child's residence.  Ruiz, 392 F.3d at 1252-53.  Here, the inquiry is whether there was a settled intent between petitioner and respondent, the biological parents of the child, to abandon the United States and to establish France as the permanent residence of the child.  This settled intention need not have existed at the time of departure from the United States, but can develop during the course of the stay in France even if the original intent had been a temporary relocation.  Ruiz, 392 F.3d at 1252.

The testimony did not establish that there was an initial settled intent to abandon the United States as the place of habitual residence.  Petitioner was a French citizen who had overstayed his visa, and his habitual place of residence was clearly France.  Respondent was a United States citizen whose habitual place of residence was clearly Florida.  Respondent testified that when they left Florida for France, the intent was to stay for one year, maybe two; petitioner did not testify about

-18-

this, but did not dispute it.  The Court finds that the evidence at least casts doubt upon whether, at the time they went to France, there was a shared settled intent to make France their habitual residence.

The Court finds, however, that petitioner has established by a preponderance of the evidence that there developed an implicit shared intent to establish France as the place of habitual residence for petitioner, respondent, and the child.  Several months after arriving in France, respondent returned to the United States to obtain work and an apartment.  Respondent then returned to France, although the reason is disputed by the parties.  Near the end of the one year time period of which respondent testified, petitioner and respondent obtained their own apartment in France, where they lived together for almost three years.  Notably, respondent returned to France after various trips to the United States.

During their time in the apartment, as well as their time in the home of petitioner's parents, the child did all the normal things to become acclimatized to France.  She went to school, learned French, went to day care, received medical care from a doctor, and took special lessons.  Respondent also became acclimatized, although with more difficulty.  Respondent obtained employment in France, eventually took French language lessons, and obtained the required paperwork to acquire legal status in France.  Respondent registered with the Caisse Primaire d'Assurance Maladie

in the Val d'Oise and obtained health benefits through the French government's social security system.  Respondent complained that petitioner denied her "vacations" in United States, not an indication that she considered the United States as her habitual residence.

Even upon her separation from her husband, respondent stayed in the apartment with her children for over a year.  Within three months of the start of the separation, respondent's French boyfriend was living in the apartment with respondent and her children.  The marital problems did not cause respondent to return to Florida where her parents resided or to Oklahoma where her sister resided; rather, she stayed in France for fifteen months. Respondent checked with three French law firms concerning divorce and child custody laws in France before deciding to leave France after receiving legal opinions she did not like.

Alternatively, even if there was never any shared and settled intent, the objective facts establish that France became the child's habitual residence before the March 30, 2005 removal.  When there is no settled intent by the parents to abandon the United States as the child's habitual residence, the Court is hesitant to find a change in habitual residence unless (1) the "objective facts point unequivocally to a change" in habitual residence; or (2) the court can "say with confidence that the child's relative attachments to the two countries have changed to the point where requiring return to [the United States] would now be tantamount to

changing the child's family and social environment in which [her] life has developed." <u>Ruiz</u>, 392 F.3d at 1255 (quoting <u>Mozes v. Mozes</u>, 239 F.3d 1067, 1081 (9th Cir. 2001)).  In this case, as discussed above, the child did all the normal kinds of things to become acclimatized to France.  She went to school, learned French, went to day care, received medical care from a doctor, and took special lessons.  The child arrived in France when she was four months old, and was taken from France at five years of age.  Thus, all but four months of her life was spent in France.  Respondent obtained French working papers, obtained employment in France, registered with the French social security, and received health benefits through the French social security.

### (3) Rights of Custody:

Because the child's habitual residence at the time of removal was France, the law of France governs the decision as to whether custody rights existed at the time of removal.  <u>Miller v. Miller</u>, 240 F.3d 392, 401 (4th Cir. 2001).  Petitioner must establish by a preponderance of the evidence that the removal or retention breached his custody rights under the law of France.

Under French law, parental authority is considered a set of rights and duties which is vested in the father and mother until the majority or emancipation of the child.  C. Cɪᴠ., art. 371-1.  As applies to this case, a father and a mother exercises common parental authority.  C. Cɪᴠ., art. 372.  A child may not leave the family home without permission of both the father and the mother.

-21-

C. CIV., art. 371-3.  The separation of the parents has no impact on the rules governing the exercise of parental authority.  C. CIV., art. 373-2.  Any change of residence of one of the parents which modifies the terms of the exercise of parental authority cannot be undertaken without prior timely notice, and if the parents cannot agree, they most submit the issue to the French courts.  C. CIV., art. 373-2; Petitioner's Exhibit 14.  The evidence clearly establishes that, under French law, petitioner had "rights of custody" concerning the child at the time of removal.

The second component of this requirement is that petitioner establish that his rights of custody were breached by the removal of the child.  At the conclusion of the trial, the Court raised the issue of whether the removal from France violated petitioner's rights of custody.  This concern was based upon <u>dicta</u> found in <u>Furnes</u> which stated that French courts had concluded "that removal of a child in violation of a *ne exeat* right does not constitute wrongful removal under the Hague convention."  <u>Furnes</u>, 362 F.3d at 718.  Petitioner's Supplemental Memorandum argues that French case law is not uniform as to the issue and that this case is factually distinguishable.

The Court concludes that the evidence in this case establishes that respondent's removal of the child from France was a wrongful removal under the Hague Convention.  Petitioner has produced an affidavit from a qualified French attorney to that effect.  Petitioner's Exhibit 14.  More importantly, the French court has

already effectively ruled that the removal was wrongful and has ordered custody of the child to be with petitioner.  The French Court's July 21, 2005, Non-Conciliation Order noted that petitioner was asking for exclusive parental authority, but stated that parental authority consists of certain rights and responsibilities which are shared by the father and mother until the child reaches majority or is emancipated.  Petitioner's Exhibit 1, Tab D, p. 2. The French court pointedly noted that respondent did not bring the matter before the court prior to her sudden departure, as was the normal course, and found that "it is appropriate to rule that the children should reside with their father, while reserving the mother's rights of visitation and housing."  Petitioner's Exhibit 1, Tab D, p. 4.  Thus, the French court found "that parental authority is shared; . . . [o]rders that the interdiction to take the children out of the French territory without the written consent of both parents be entered in the passports of the parents; [d]ecides that the children will live with their father. [r]eserves the rights of visitation and housing for the mother." Petitioner's Exhibit 1, Tab D, p. 5.

**(4) Petitioner Was Exercising Rights of Custody at Removal:**

Petitioner has the burden of showing by a preponderance of the evidence that he was exercising custody rights at the time of the removal.  <u>Lops</u>, 140 F.3d at 936.  While the Hague Convention does not define the "exercise" of rights of custody, the Sixth Circuit has stated that "[t]he only acceptable solution, in the absence of

a ruling from a court in the country of habitual residence, is to liberally find 'exercise' whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." <u>Friedrich</u>, 78 F.3d at 1065.  The court went on to "hold that, if a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child."  <u>Id.</u> at 1066. <u>See</u> <u>also</u> <u>Furnes</u>, 362 F.3d at 711; <u>Pesin</u>, 77 F. Supp. 2d at 1286-87.

Under this standard, petitioner has established he was exercising his rights of custody at the time the child was removed. Petitioner continued to share custody of the children and participate in their lives during his separation from his wife. Respondent essentially asserts that petitioner was not exercising his parental rights well.  While this may be subject to argument, the Court finds that it is clear that petitioner was exercising parental rights within the meaning of the Hague Convention.

In sum, the Court concludes that Petitioner has established his case by at least a preponderance of the evidence.  His child is under 16 years of age; the child was habitually a resident of France at the time of removal and the time retention began; the removal of the child from France violated Petitioner's rights of custody under French law; the retention of the children in the United States violated Petitioner's rights of custody under French

-24-

law; and Petitioner was exercising his rights of custody at the time of the removal and the time of retention.  Unless Respondent establishes an exception, the child must be returned to France.

**B.  Exceptions to Return of Child:**

The six exceptions to the required return of a child are to be applied narrowly.  <u>Rydder v. Rydder</u>, 49 F.3d 369, 372 (8th Cir. 1995); 42 U.S.C. § 11601(a)(4).  Because respondent was proceeding *pro se* until very recently, the Court considers all exceptions even though not all have been actively pursued by respondent.

**(1) Not Exercising Rights of Custody:**

A court is not bound to order the return of a child if respondent demonstrates by a preponderance of the evidence that the person having care of the child was not exercising rights of custody at the time of the removal or retention of the child. Hague Convention art. 13a; 42 U.S.C. § 11603(e)(2)(B); <u>Furnes</u>, 362 F.3d at 711-12.  The Court has already found that petitioner has established by a preponderance of the evidence that he *was* exercising his rights of custody regarding the child at the time of removal and retention.  Accordingly, this exception has not been established by respondent.

**(2) Petitioner's Consent/Subsequent Acquiescence:**

A court is not bound to order the return of a child if respondent demonstrates by a preponderance of the evidence that the person having care of the child had consented to or subsequently

acquiesced in the removal or retention of the child. Hague Convention art. 13a; 42 U.S.C. § 11603(e)(2)(B). Petitioner testified that he did not consent to the removal of his daughter from France or the retention of his daughter in the United States, and did not acquiesce in either. All the evidence supports this testimony. The Court concludes that petitioner did not consent to the removal of the children within the meaning of the Hague Convention or the retention of the child in the United States. Therefore, this exception has not been established.

   **(3) Wishes of the Child:**

   A court is not bound to order the return of a child if respondent demonstrates by a preponderance of the evidence that "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention art. 13, unnumbered paragraph; 42 U.S.C. § 11603(e)(2)(A). This provides a separate and independent basis for a court to refuse to return a child to the country of habitual residency, Blondin v. Dubois, 238 F.3d 153, 166 (2d Cir. 2001), although like other exceptions it is narrowly applied. England, 234 F.3d at 272.

   At age six, the child in this case has not attained an age or degree of maturity to make it appropriate to take her views into account. E.g., Mendez Lynch, 220 F. Supp. 2d at 1361-62. Therefore, this exception does not apply.

**(4)   Child Well-Settled in New Environment:**

Article 12 of the Hague Convention requires that a court "shall order the return of a child forthwith" where there has been a wrongful removal or retention and less than one year has expired between the date of the wrongful removal or retention and "the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is." Even if commencement begins more than one year thereafter, the child "shall" be returned unless it is demonstrated that "the child is now settled in its new environment." Thus, a court is not bound to order the return of a child if respondent demonstrates by a preponderance of the evidence that (a) the proceedings were commenced more than one year after the date of the wrongful removal or retention, and (b) "the child is now settled in its new environment." Hague Convention art. 12. The key dates under the Hague Convention are the dates of the wrongful removal or detention and "the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is." Hague Convention art. 12. Under ICARA the "commencement of proceedings" begins with the filing of a judicial petition. Wojcik v. Wojcik, 959 F. Supp. 413, 418-19 (E.D. Mich. 1997).

The Petition (Doc. #1) was filed in federal court on March 8, 2006. Therefore, the Court petition was filed within one year of

Respondent's wrongful removal on March 30, 2005.  Accordingly, this exception cannot be established by respondent.

### (5) Grave Risk of Exposure to Physical or Psychological Harm or Intolerable Situation:

A court is not bound to order the return of a child if respondent demonstrates by clear and convincing evidence that there is a grave risk that the child's return would "expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."  Hague Convention art. 13 b; 42 U.S.C. § 11603(e)(2)(A).  This exception therefore requires evaluation of the grave risk of physical harm to the children, psychological harm to the children, or if return would otherwise place the children in an intolerable situation. Like the other exceptions, this is a narrow exception.  England, 234 F.3d at 270-71;  Whallon v. Lynn, 230 F.3d 450, 459 (1st cir. 2000); Nunez-Escudero v. Tice-Menley, 58 F.3d 374, 376 (8th Cir. 1995).

The assessment focuses upon the child, and it does not matter if the respondent is the better parent in the long run, had good reason to leave her home in France, or whether she will suffer if the child is returned to France.  Nunez-Escudero, 58 F.3d at 377.  "The exception for grave harm to the child is not license for a court in the abducted-to country to speculate on where the child would be happiest."  Friedrich, 78 F.3d at 1068.  "A removing parent must not be allowed to abduct a child and then—when brought

to court—complain that the child has grown used to the surroundings to which they were abducted." Friedrich, 78 F.3d at 1068.

This exception requires the alleged physical or psychological hare to be "a great deal more than minimal. Whallon, 230 F.3d at 459 (quoting Walsh v. Walsh, 221 F.3d 204, 218 (1st Cir. 2000)). Only severe potential harm to the child will trigger this Article 13b exception. Nunez-Escudero, 58 F.3d at 377 (quoting the Supreme Court of Canada in Thomson v. Thomson, 119 D.L.R. 4th 253, 286 (Can. 1994)). The harm must be greater than what is normally expected when taking a child away from one parent and passing the child to another parent. Whallon, 230 F.3d at 459. The harm of separating a child from the primary caretaker does not satisfy the Article 13b exception. Rydder v. Rydder, 49 F.3d at 372; Nunez-Escudero, 58 F.3d at 376. Adjustment problems that would attend the relocation of most children is not sufficient. Friedrich, 78 F.3d at 1067.

The Court finds that there is no credible evidence that petitioner has ever physically harmed either of the two children. The Court further finds that respondent has not shown by clear and convincing evidence that the child would be exposed to physical or psychological harm if she is returned to France. The child has a place to live which is familiar to the child; she will live with her biological father; and with grandparents known to her. The Court discounts the credibility of respondent's recent testimony concerning the unfitness of the grandparents' home. In any event,

that testimony even if fully credible would not satisfy the level of physical or psychological harm required by the exception.

The "intolerable situation" portion of the exception encompasses evaluation of the people and circumstances awaiting that child in the country of her habitual residence.  The Court may consider the environment in which the child will reside upon returning to France.   Nunez-Escudero, 58 F.3d at 377.  The United States Department of State has stated that an "intolerable situation" under Article 13b was not intended to encompass situations such as return to a home where money is in short supply, or where educational or other opportunities are more limited than in the new country.   It gave as an example of "intolerable situation" where the custodial parent sexually abuses a child . Hague Convention, 51 Fed. Reg. 10494-01, 10510 (March 26, 1986).

> In other words, at one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation.  The former do not constitute a grave risk of harm under Article 13(b); the latter do.

Blondin, 238 F.3d at 162.  At least one court had upheld consideration of whether the children were well settled in their new environment, and the children's views of repatriation as part of the grave risk evaluation.  Blondin, 238 F.3d at 157-60.  In Friedrich, the Sixth Circuit indicated that the grave risk exception applies only (1) when returning the child meant sending

her to a zone of war, famine or disease, or (2) in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence for whatever reasons may be incapable or unwilling to give the child adequate protection. Friedrich, 78 F.3d at 1069.

Here, there is no evidence that either the conditions in France in general or the living conditions at the home of petitioner's parents specifically come anywhere close to satisfying the "intolerable conditions" exception.  Respondent has not shown that this exception applies.

**(6) Human Rights and Fundamental Freedoms:**

A court is not bound to order the return of a child if respondent demonstrates, by clear and convincing evidence, that return of the child would not be permitted by fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms.  Hague Convention art. 20. Respondent has failed to produce any evidence to establish she comes within this exception.

### IV. Conclusion

The Court finds by at least a preponderance of evidence that Petitioner has met his burden under the Hague Convention and ICARA of establishing that: (1) the child habitually resided in France prior to her removal on March 30, 2005; (2) Respondent breached petitioner's custodial rights under French law by removing the

child from France and retaining her in Florida; and (3) Petitioner possessed and was exercising custodial rights at the time of the child's removal and retention.  Additionally, the Court finds that respondent has not established any exception.  As the Eleventh Circuit has stated, "The Hague Convention is intended to restore the pre-abduction status quo . . . ." <u>Lops</u>, 140 F.3d at 936. Therefore, the child must be returned to France.  The Court will impose the conditions set forth below, and notes that petitioner has stated under oath that he will comply with the undertaking relating to the dismissal of charges in France against respondent.

Accordingly, it is now

**ORDERED AND ADJUDGED** that:

1. Petitioner's Petition for Return of Children (Doc. #1) is **GRANTED**.

2.  Respondent Cory Dallemagne is ordered to surrender custody of Desiree Dallemagne. to petitioner Frederic Dallemagne no later than twelve noon on July 17, 2006, for return to France with petitioner.  Counsel for petitioner shall coordinate arrangements with respondent and her attorney.

3.   Desiree Dallemagne shall be returned to France at petitioner's expense.  Respondent may accompany petitioner and the child to France if she chooses, or may join petitioner and the child in France at a later date.

4.   Frederic Dallemagne shall dismiss any pending criminal proceedings in France against Cory Dallemagne, relating in any way to the removal or retention of the child; he shall take no steps to pursue or re-initiate such charges; and he shall take all steps within his lawful power to see that such charges are not pursued, initiated or re-initiated.

5.   The issue of permanent custody of the child is to be determined by the courts in France.

6.   The Clerk of the Court shall notify counsel for the petitioner and the respondent of this Opinion and Order immediately, and provide petitioner two certified copies of this Opinion and Order.

7.   The Clerk shall close the case.

**DONE AND ORDERED** in Fort Myers, Florida this __13th__ day of July, 2006.

_____
JOHN E. STEELE
United States District Judge

Copies:
Counsel of Record